1  COLLINSON LAW, A Professional Corporation
2  Laura E. Inlow, State Bar No. 130584
   Matthew W. McAleer, State Bar No. 278595
3  21515 Hawthorne Blvd., Suite 800
   Torrance, California 90503
4  Telephone: (424) 212-7777/Facsimile: (424) 212-7757

5
6  Attorneys for Defendants RICARDO HUERTA, RUDOLPH RIVERA, and ALDO
   QUINTERO

7
8  Michael N. Feuer, City Attorney-State Bar No. 11529x
   Thomas H. Peters, Chief Assistant City Attorney- State Bar No. 163388
9  Cory M. Brente, Assistant City Attorney- State Bar No. 115453
   Rena M. Shahandeh, Deputy City Attorney-State Bar No. 198072
10 200 N. Main Street
   Los Angeles, CA 90012
11 Telephone: (213) 978-7029/Fax: (213) 978-8785

12
13 Attorneys for Defendant, CITY OF LOS ANGELES

14                **UNITED STATES DISTRICT COURT**
15                **CENTRAL DISTRICT OF CALIFORNIA**

16

17 RUFINA MOLINA, ESTATE OF LUIS          **CASE NO. CV16-1293 ODW(ASx)**
   MARTINEZ, by and through successor in   Hon. Otis D. Wright
18 interest, RUFINA MOLINA,
                    Plaintiffs,           **DEFENDANTS' JOINT MOTION**
19                                         **FOR SUMMARY JUDGMENT**
   v.                                      **OR, IN THE ALTERNATIVE,**
20                                         **MOTION FOR PARTIAL**
21 CITY OF LOS ANGELES; RICARDO            **SUMMARY JUDGMENT**
   HUERTA, RUDOLPH RIVERA, ALDO
22 QUINTERO, and DOES 1 through 10,        [Filed Concurrently with Statement
   inclusive,                             of Uncontroverted Facts; Appendix
23                                         of Exhibits; Declarations; and
                    Defendants.           [Proposed] Order]
24
25
26                                         Date:  February 13, 2017
27                                         Time:  1:30 p.m.
28                                         Courtroom:  5D

COLLINSON LAW
A PROFESSIONAL CORPORATION
21515 HAWTHORNE BLVD., SUITE 800
TORRANCE, CALIFORNIA 90503
TEL. (424) 212-7777 | FAX (424) 212-7757

- 1 -

Action Filed: April 22, 2015
Trial Date:  April 4, 2017

TO THE HONORABLE COURT AND ALL PARTIES HEREIN:

PLEASE TAKE NOTICE that at 1:30 p.m. on Monday, February 13, 2017 or as soon thereafter as the matter may be heard in Courtroom 5D, before the Honorable Otis D. Wright, United States District Court Judge, located at 350 W. 1st Street, 5th Floor, Los Angeles, CA 90012, defendants City of Los Angeles, Ricardo Huerta, Rudolph Rivera, and Aldo Quintero (hereinafter referred to as "City," "Huerta," "Rivera," and "Quintero" respectively and as "defendants" collectively) will and hereby do move this Court, pursuant to Rule 56 of the *Federal Rules of Civil Procedure*, for summary judgment or, in the alternative, partial summary judgment against plaintiffs on the grounds that there are no genuine issues of material fact with regard to the following issues raised in the First Amended Complaint ("FAC"):

1. Plaintiffs' first cause of action for excessive force/unreasonable seizure fails as a matter of law;

2. Plaintiffs' second cause of action for interference with familial integrity as a substantive due process violation fails as a matter of law; and

3. Plaintiffs' third cause of action for municipal liability for unconstitutional customs and practices fails as a matter of law.

This motion is based upon this Notice of Motion and Motion, the Memorandum of Points and Authorities attached hereto, the declarations of Matthew W. McAleer, Ricardo Huerta, Rudolph Rivera and Aldo Quintero, all

COLLINSON LAW
A PROFESSIONAL CORPORATION
21515 HAWTHORNE BLVD., SUITE 800
TORRANCE, CALIFORNIA 90503
TEL. (424) 212-7777 | FAX (424) 212-7757

papers, pleadings, and records on file herein, the Statement of Uncontroverted

Facts, and Appendix of Exhibits filed concurrently herewith and on such other

matters as may properly come before the Court before or at the hearing.

## MEET AND CONFER

Pursuant to local rule 7-3, defense counsel attempted to meet and confer

with counsel for plaintiffs on numerous occasions regarding the issues raised in the

instant motion.  However, plaintiffs' counsel did not meet and confer with defense

counsel at any of the agreed-upon times thereby refusing to dismiss any portion of

the FAC thus necessitating the instant motion.   (Decl. McAleer ¶¶3-8)


DATED:  January 13, 2017          COLLINSON LAW
                                  A Professional Corporation

                                  By:  _____/s/_____
                                        Laura E. Inlow, Esq.
                                        Matthew W. McAleer, Esq.
                                        Attorneys for Defendants,
                                        Ricardo Huerta, Rudolph Rivera, and
                                        Aldo Quintero

DATED:  January 13, 2017          **MICHAEL N. FEUER**, City Attorney
                                  **THOMAS H. PETERS**, Chief Assistant City
                                  Attorney
                                  **CORY M. BRENTE**, Assistant City Attorney


                                  By:  _____/s/_____
                                        **RENA M. SHAHANDEH**, Deputy City
                                        Attorney
                                        Attorneys for Defendant, City of Los
                                        Angeles

COLLINSON LAW
A PROFESSIONAL CORPORATION
21515 HAWTHORNE BLVD. SUITE 800
TORRANCE, CALIFORNIA 90503
TEL. (424) 212-7777 | FAX (424) 212-7757

**Table of Contents**

*I.    STATEMENT OF FACTS* ........................................................................ *1*

*II.   AUTHORITY FOR MOTION* ............................................................ *8*

*III.  PLAINTIFFS' CLAIM OF EXCESSIVE FORCE/UNREASONABLE SEIZURE FAILS* ... *10*

*a.    Martinez Posed an Immediate and Deadly Threat to Officer Rivera* ............................... *11*

*b.    No Specific Warning Required Before Using Deadly Force* .............................. *14*

*IV.   PLAINTIFFS LACK STANDING ON THE FOURTH AMENDMENT CLAIM* ................ *18*

*V.    PLAINTIFFS' CLAIM OF INTERFERENCE WITH FAMILIAL INTEGRITY FAILS* ...... *19*

*VI.   PLAINTIFFS' CLAIM OF MUNICIPAL LIABILITY FOR UNCONSTITUTIONAL CUSTOMS AND PRACTICES FAILS* ............................... *21*

*VII.  THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY* ....... *23*

*VIII. CONCLUSION* ................................................................................ *25*

COLLINSON LAW
A PROFESSIONAL CORPORATION
21515 HAWTHORNE BLVD., SUITE 800
TORRANCE, CALIFORNIA 90503
TEL. (424) 212-7777 | FAX (424) 212-7757

1

2

**Table of Authorities**

3

*A.D. v. Calif. Hwy. Patrol (2013) 712 F.3d 446, 453*..................................................... 21

*Act Up!/Portland v. Bagley (9th Cir. 1993) 988 F.2d 868, 871* ...................................... 24

*Adell v. Las Vegas Metro Pol. Dept. (9th Cir. 2001) 268 F.3d 924* ............................... 22

*Adickes v. S.H. Kress & Co. (1970) 398 U.S. 144, 157* .................................................... 8

*Alderman v. U.S. (1969) 394 U.S. 165*............................................................................ 11

*Billington v. Smith (9th Cir. 2002) 292 F.3d 1177, 1189* ...................................... 17, 24

*Blair v. City of Pomona (9th Cir. 2000) 223 F.3d 1074* ................................................ 21

*Blanford v. Sacramento County (9th Cir. 2005) 406 F.3d 1110, 2005 U.S. App. LEXIS 7893*..... 11

*Canton v. Harris (1989) 489 U.S. 378, 389*.................................................................... 21

*Castro v. City of Mendota, 2012 U.S. Dist. LEXIS 138699, *33-34 (E.D. Cal. 2012)*............... 23

*Celotex Corp v. Catrett (1986) 477 U.S. 317, 323* ........................................................... 8

*City and County of San Francisco, Calif. v. Sheehan (2015) 135 S. Ct. 1765* ...................... 16, 24

*City of St. Louis v. Praprotnik (1988) 485 U.S. 112* ....................................................... 21

*Cosentino v. Kurtz, 2013 U.S. Dist. LEXIS 69218 (C.D. Cal. 2013)*.............................. 13

*County of Sacramento v. Lewis (1998) 523 U.S. 833, 853* ............................................. 21

*David v. City of Fremont, 2006 U.S. Dist. LEXIS 57211 at *28-34 (N.D. Cal. 2006)*................ 17

*Davis v. City of Ellenburg (9th Cir. 1989) 869 F.2d 1239* ............................................. 22

*Deorle v. Rutherford (9th Cir. 2001) 272 F.3d 1272, 1284*............................................ 14

*Devereaux v. Abbey (9th Cir. 2001) 263 F.3d 1070, 1076* ............................................... 8

*Forrester v. City of San Diego (9th Cir. 1994) 25 F.3d 804* ...................................... 10, 15

*Fortyune v. American Multi- Cinema, Inc.(9th Cir. 2004) 364 F. 3d 1075, 1080* ................ 8

*FTC v. Publ'g Clearing House, Inc. (9th Cir. 1996) 104 F.3d 1168, 1171* ..................... 9

*Gantt v. City of L.A. (9th Cir. 2013) 717 F.3d 702, 707*................................................ 20

*Glenn v. Washington City (9th Cir. 2011) 673 F.3d 864, 872*........................................ 14

*Graham v. Connor (1989) 490 U.S. 386, 397*.................................................................. 10

COLLINSON LAW
A PROFESSIONAL CORPORATION
21515 HAWTHORNE BLVD., SUITE 800
TORRANCE, CALIFORNIA 90503
TEL. (424) 212-7777 | FAX (424) 212-7757

1    *Harlow v. Fitzgerald (1982) 457 U.S. 800, 818* ................................................ 23

2    *Harris v. Roderick (9th Cir. 1997) 126 F.3d 1189, 1201* ................................. 15

3    *Hayes v. Cnty. of San Diego (9th Cir. 2013) 736 F.3d 1223, 1230* .................... 18, 20

4    *Jackson v. City of Bremerton (9th Cir. 2001) 268 F.3d 646* ............................. 10

5    *Kelson v. City of Springfield (9th Cir.1985) 767 F.2d 651* ............................... 19

6    *Marks v. U.S. (9th Cir. 1978) 578 F.2d 261, 263* ............................................. 9

7    *Martinez v. County of Los Angeles (1996) 47 Cal. App.4th 334* ....................... 11

8    *Matsushita Elec. Indus. Co. v. Zenith Radio Corp. (1986) 475 U.S. 574, 586* ............ 9

9    *McDade v. West (9th Cir. 2000) 223 F.3d 1135, 1141* ..................................... 22

10   *Monell v. Dept. of Soc. Serv. (1978) 436 U.S. 658* ........................................... 21

11   *Moreland v. Las Vegas Metro. Police Dep't (9th Cir. 1998) 159 F.3d 365, 371* ............ 18, 20

12   *Nelson v. City of Davis (9th Cir. 2012) 685 F.3d 867, 882* ............................... 14

13   *Oklahoma v. Tuttle (1995) 471 U.S. 808, 823* ................................................ 21

14   *Plakas v. Drinski, 19 F.3d 1143, 1148-49 (7th Cir. 1993)* ............................... 17

15   *Plumhoff v. Rickard (2014) 134 S.Ct. 2012, 2023* ........................................... 25

16   *Porter v. Osborn (9th Cir. 2008) 546 F.3d 1131, 1137* ................................... 20

17   *Roy v. Inhabitants of Lewiston (First Cir. 1994) 42 F.3d 691, 695* .................... 24

18   *Saucier v. Katz, supra, 533 U.S. at 216, n. 6* ................................................. 24

19   *Scott v. Harris (2007) 550 U.S. 372, 380* ......................................................... 9

20   *Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1992)* ........................................ 17

21   *Smith v. City of Fontana (9th Cir. 1987) 818 F.2d 1411, 1417* ......................... 11, 18

22   *Tatum v. City & Cnty. of San Francisco (9th Cir. 2006) 441 F.3d 1090, 1093 n.2* ......... 18

23   *Tennessee v. Garner (1985) 471 U.S. 1, 11-12* ................................................. 15

24   *Trevino v. Gates (9th Cir. 1996) 99 F.3d 911, 918* ........................................ 22

25   *U.S. v. $109,179 (9th Cir. 2000) 228 F.3d 1080, 1084* ................................... 11

26   *Wilkinson v. Torres (9th Cir. 2010) 610 F.3d 546, 554* ................................... 20

27   **Statutes**

28

COLLINSON LAW
A PROFESSIONAL CORPORATION
21515 HAWTHORNE BLVD., SUITE 800
TORRANCE, CALIFORNIA 90503
TEL. (424) 212-7777 | FAX (424) 212-7757

DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

*FRCP 56 (c)* .................................................................................................................... 9

FRCP 56(c); ..................................................................................................................... 8

**Rules**

42 U.S.C. section 1983 ................................................................................................. 11

FRCP 56(c) ....................................................................................................................... 8

COLLINSON LAW
A PROFESSIONAL CORPORATION
21515 HAWTHORNE BLVD., SUITE 800
TORRANCE, CALIFORNIA 90503
TEL. (424) 212-7777 | FAX (424) 212-7757

DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

COLLINSON LAW
A PROFESSIONAL CORPORATION
21515 HAWTHORNE BLVD., SUITE 800
TORRANCE, CALIFORNIA 90503
TEL. (424) 212-7777 | FAX (424) 212-7757

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   STATEMENT OF FACTS

Plaintiffs Rufina Molina (hereinafter "Molina") and the Estate of Luis Martinez, by and through its successor in interest, Rufina Molina, filed the operative First Amended Complaint (FAC) on April 21, 2016 arising out of the death of Molina's son, Luis Martinez (hereinafter "Martinez"), on April 21, 2015. The FAC alleges three causes of action as follows: 1) excessive force/improper seizure of the decedent under the Fourth Amendment, 2) interference with familial integrity under the Fourteenth Amendment, and 3) a *Monell* claim against the City of Los Angeles under 42 U.S.C. §1983.  (UMF 1)

On Tuesday, April 21, 2015, at approximately 4:25 p.m., Monica Ramirez telephoned 911 to report that her husband, Luis Martinez, had stabbed himself with a knife but was no longer armed. Ms. Ramirez reported to the 911 operator that Martinez was depressed and in need of emergency medical treatment at their apartment located in Los Angeles. (UMF 2)  According to Ms. Ramirez, she had entered their bedroom and observed Martinez sitting in a wheelchair with the front of his shirt covered in blood and a kitchen knife lying across his lap.  When Martinez would not speak, Ms. Ramirez concluded that he had stabbed himself and she tried unsuccessfully to convince him to go to an emergency room with her. After taking the knife away from Martinez, she called 911 to request an ambulance.  (UMF 3)  Martinez had been using a wheelchair during his convalescence after fracturing his pelvis when he jumped or fell off the third floor of his apartment building while high on methamphetamines on January 21, 2015. (UMF 4)

The LAPD Communications Division broadcast a radio call for an attempted suicide at the residence of Ms. Ramirez and Martinez.  The call was assigned to LAPD Officer Aaron Skiver and his partner defendant Huerta.  (UMF 5)  Officer Huerta shared the comments related to the incident, that Martinez was suffering from depression, had stabbed himself  but was no longer armed, with Officer Skiver. (UMF 6)  At approximately 4:34 p.m., Officers Skiver and Huerta parked their vehicle in front of Martinez's apartment complex.  (UMF 7)  At about the same time, defendant Quintero arrived at the location and joined Officers Skiver and Huerta.  (UMF 8)  After finding that the lobby entrance doors were locked, Officer Skiver gained entry to the apartment building by using his pocketknife to open a nearby stairwell door.  (UMF 9)  Once inside, Officers Skiver and Quintero went to the fourth floor while Officer Huerta remained in the lobby to prop open the entrance door for other LAPD units and the Fire Department who he knew were also responding.  (UMF 10)

As Officers Skiver and Quintero made their way up the stairwell of the apartment complex, Officer Quintero donned a pair of latex gloves so as to be ready to render first aid to Martinez based upon the likelihood that he was bleeding. (UMF 11)  Each of the defendant officers were trying to reach Martinez quickly to render medical aid until the paramedics arrived.  (UMF 12)  Officers Huerta and Skiver had a Taser in their car but did not bring it up to the apartment because they were concerned with getting to the location quickly to render aid. (UMF 13)  Officer Quintero did not have a Taser on April 21, 2015.  (UMF 14)

Upon reaching the fourth floor, Officers Skiver and Quintero saw Ms. Ramirez standing just outside of her apartment at the opposite end of the landing.

COLLINSON LAW
A PROFESSIONAL CORPORATION
21515 HAWTHORNE BLVD., SUITE 800
TORRANCE, CALIFORNIA 90503
TEL. (424) 212-7777 | FAX (424) 212-7757

COLLINSON LAW
A PROFESSIONAL CORPORATION
21515 HAWTHORNE BLVD., SUITE 800
TORRANCE, CALIFORNIA 90503
TEL. (424) 212-7777 | FAX (424) 212-7757

1   (UMF 15)  Ms. Ramirez waved the officers over and when they arrived she told

2   them that Martinez had cut himself with a knife because he was depressed but that

3   he was no longer armed as she had taken the knife away and placed it on the

4   kitchen counter.  Ms. Ramirez directed the officers into her apartment.  (UMF 16)

5   Less than a minute later, defendant Rivera and his partner, Officer Jack Tuck, as

6   well as Detective Steven Juarez arrived at the apartment building and met Officer

7   Huerta in the lobby of the apartment complex.  The entire incident lasted about five

8   minutes after Officers Rivera and Tuck arrived. (UMF 17)  Officers Rivera and

9   Tuck had a Taser in their car but did not bring it up to the apartment because they

10  were also concerned about getting there quickly to render aid.  All four officers

11  took the elevator to the fourth floor of the complex to join Officers Skiver and

12  Quintero.  (UMF 18)

13          Officers Skiver and Quintero were the first to enter Martinez's apartment.

14  They observed him seated in a wheelchair in the center of the living room,

15  approximately 17 feet from the entrance of the apartment.  (UMF 19)  Officer

16  Quintero observed that Martinez's shirt was covered in blood and he believed that

17  Martinez had sustained a significant injury.  (UMF 20)  As he approached

18  Martinez, Officer Skiver asked him what was wrong and where he was injured, but

19  Martinez did not respond.  (UMF 21)

20          As Officer Skiver came within approximately five feet of Martinez,

21  Martinez used his feet to roll himself backward in his wheelchair until he reached a

22  sliding glass door on the north side of the living room.  Officer Skiver again asked

23  Martinez what was wrong and how they could help him, but Martinez remained

24  silent.  (UMF 22)  Martinez then reached underneath his right thigh and pulled out

3

an approximately eight and half inch fixed-blade knife that he had been concealing. (UMF 23)  The knife Martinez had in the wheelchair was not the same knife that he had initially used to stab himself.  (UMF 24)  Martinez held the knife in his right hand with his arm fully extended in front of him and the blade pointing outward.  Officer Skiver announced several times that Martinez had a knife while he began walking backward away from Martinez. (UMF 25)  In response to seeing the knife, Officers Skiver and Quintero un-holstered their pistols but kept them at the low ready position.  (UMF 26)  Officers Tuck, Rivera, Huerta and Juarez arrived at the apartment just as Officer Skiver announced that Martinez had the knife.  (UMF 27)

Out of concern for Ms. Ramirez's safety, she was escorted out of the apartment and into the hallway. She then went to the apartment of her neighbors in Unit 402.  (UMF 28)  Officer Skiver repeatedly ordered Martinez in English to drop the knife and put his hands up but Martinez neither complied nor responded. (UMF 29)  Officer Quintero then gave similar commands in Spanish, but Martinez did not comply or respond. (UMF 30)  Martinez slowly pushed himself out of his wheelchair to a standing position. Without saying a word, Martinez then began walking toward the officers with the knife clenched in his right hand.  After taking about five to six steps, Martinez walked back and sat down again.  (UMF 31)

Officer Skiver reiterated his command for Martinez to drop the knife and telling him that the officers were there to help, but Martinez neither complied nor responded.  (UMF 32)  Within a few moments, Martinez stood up again and began pacing in the living room. Officers Rivera and Huerta now stood on either side of

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COLLINSON LAW
A PROFESSIONAL CORPORATION
21515 HAWTHORNE BLVD., SUITE 800
TORRANCE, CALIFORNIA 90503
TEL. (424) 212-7777 | FAX (424) 212-7757

Officer Skiver near the threshold of the apartment and attempted to communicate with Mr. Martinez in Spanish, but he did not respond.  (UMF 33)  Martinez was told repeatedly to drop the knife, that the officers just wanted to help him and that he did not want to do this. However, throughout the incident, Martinez never said a word.  (UMF 34)

While watching Martinez from the doorway, Officer Skiver asked Officer Tuck to retrieve a Taser from his vehicle.  Officer Tuck acknowledged the request and left the scene to obtain a Taser.  (UMF 35)  At about the same time, Detective Juarez broadcast a radio request for additional units on an emergency basis.  (UMF 36)  The shooting occurred about a minute later before Officer Tuck returned. (UMF 37)  Officer Skiver directed the other officers to step back out of the threshold of the apartment to create more space between themselves and Martinez. (UMF 38)

Martinez then stopped pacing in the living room and re-adjusted his hold on the knife to an overhand grip.  He placed the tip of the blade against his chest and pushed it an inch or two into his body by hitting on the handle with his other hand. (UMF 39)  The officers continued to give Martinez commands to drop the knife in English and Spanish and reassured him they were there to help, but Martinez merely shook his head side to side as if indicating "no."  (UMF 40)  Martinez then pulled the knife out of his chest and began walking toward the officers with the knife pointed toward the officers.  (UMF 41)  In response, the officers stepped completely out of the apartment and into the exterior hallway.  Officers Quintero, Skiver and Huerta moved to the left of the entrance of the apartment while Officer Rivera stepped straight back.  (UMF 42)  Officer Rivera walked straight backward

rather than to the left with his fellow officers so as to maintain visual contact with Martinez and to stay out of the other officers' potential line of fire.  (UMF 43)

As Martinez approached the threshold of the apartment, he was still gripping the knife in his right hand with his arm extended outward. Martinez appeared to be focused on Officer Rivera and pointed the blade toward him as he walked in his direction. (UMF 44)  Officer Rivera ordered Martinez to stop and drop the knife multiple times while he simultaneously kept stepping backward.  (UMF 45) Officer Rivera also told the other officers, who were no longer in a position to see Martinez, that Martinez was about to exit the residence.  (UMF 46)  After moving backward approximately 7 to 8 feet, Officer Rivera found himself in an alcove that had a solid wall behind him and to his left and a metal railing to his right so that he had no more ground to surrender to Martinez.  (UMF 47)

As Martinez walked toward Officer Rivera at a fast pace, he leaned forward and held the knife pointed outward toward Officer Rivera.  (UMF 48)  Officer Rivera stated out loud that he did not want to have to shoot Martinez, but Martinez kept advancing.  (UMF 49)  When Martinez was within approximately three to five feet of Officer Rivera, Officer Rivera believed that Martinez was trying to stab or kill him and fired one round.  (UMF 50)  Martinez fell to the floor but immediately used his left arm to prop up his upper torso.  Martinez looked up at Officer Rivera, lunged forward with the knife in his right hand, and attempted to stab Officer Rivera in the leg by swinging the knife in a side-to-side motion.  (UMF 51)  In response, Officer Rivera fired a second round at Martinez's upper torso area. (UMF 52)

Officer Huerta saw Martinez push himself up using his left arm and lunge

COLLINSON LAW
A PROFESSIONAL CORPORATION
21515 HAWTHORNE BLVD., SUITE 800
TORRANCE, CALIFORNIA 90503
TEL. (424) 212-7777 | FAX (424) 212-7757

forward within one to two feet of Officer Rivera with the knife clenched in his hand.  Believing that Martinez was trying to stab Officer Rivera, he fired one round at Martinez from a distance of approximately five feet.  (UMF 53)  Officer Quintero also saw Martinez fall to the ground after being shot by Officer Rivera, support himself with his left hand, and attempt to lunge toward Officer Rivera with the knife tightly clenched in his hand with the blade pointed toward Officer Rivera. In defense of Officer Rivera's life, Officer Quintero fired two rapid shots at Martinez from a distance of approximately four feet.  (UMF 54)

After the shots were fired, Martinez was lying face down with his right arm extended in front of him, still holding the knife.  Officer Skiver used his right foot to kick the knife out of Martinez's right hand.  (UMF 55)  Martinez was then placed in handcuffs.  (UMF 56)

Firefighter/emergency medical personnel had arrived on the scene prior to the shooting and and evaluated Martinez within seconds of him being placed in handcuffs.  (UMF 57)  With the assistance of Officers Skiver and Huerta, the LAFD personnel placed Martinez on a gurney and immediately began performing cardiopulmonary resuscitation.  Despite their efforts, LAFD personnel were unable to revive Martinez and he was pronounced dead at the scene.  (UMF 58)

In April of 2015, LAPD policy did not require that patrol officers be in possession of a Taser. (UMF 59)  If a patrol officer checked out a Taser in April of 2015, they were not required to carry the Taser on their person.  (UMF 60)  In April of 2015, LAPD policy authorized an officer to use of deadly force to protect himself/herself or others from what was reasonably believed to be an imminent threat of death or serious bodily injury. (UMF 61)

COLLINSON LAW
A PROFESSIONAL CORPORATION
21515 HAWTHORNE BLVD, SUITE 800
TORRANCE, CALIFORNIA 90503
TEL. (424) 212-7777 | FAX (424) 212-7757

COLLINSON LAW
A PROFESSIONAL CORPORATION
21515 HAWTHORNE BLVD., SUITE 800
TORRANCE, CALIFORNIA 90503
TEL. (424) 212-7777 | FAX (424) 212-7757

Plaintiff Molina does not represent the estate of the decedent and is not its successor-in-interest. She has not filed an affidavit asserting standing for maintaining an action for survival in the State of California. Moreover, she has admitted in written discovery that she has no documents establishing that she is representing the estate.  (UMF 62)  In contrast, the decedent was survived by a wife and children, who did file an affidavit asserting their status as successors in interest to the estate in an action in the Los Angeles Superior Court arising out of this same incident.  (UMF 63)  Furthermore, Molina does not believe that the decedent had a will. (UMF 64)

## II.    AUTHORITY FOR MOTION

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. (FRCP 56(c); *Adickes v. S.H. Kress & Co.* (1970) 398 U.S. 144, 157; *Fortyune v. American Multi- Cinema, Inc.*(9th Cir. 2004) 364 F. 3d 1075, 1080).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file." (*Celotex Corp v. Catrett* (1986) 477 U.S. 317, 323). Summary judgment should be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  (*Id.* at 322).  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  (*Id.*)  The moving party has no burden to negate or disprove matters on which the non-moving party has the

burden of proof at trial, but need only point out to the Court through argument an absence of evidence to support the non-moving party's case.  (*Devereaux v. Abbey* (9th Cir. 2001) 263 F.3d 1070, 1076).

The opposing party may not rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits and/or admissible discovery material, in support of its contention that the dispute exists.  (*FRCP* 56 (c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* (1986) 475 U.S. 574, 586). The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." (*Id*. at 587).  To demonstrate a genuine issue, the opposing party "must do more than simply show that there is a mere metaphysical doubt as to the material facts…Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party there is no 'genuine issue for trial." (*Id.*; *Scott v. Harris* (2007) 550 U.S. 372, 380).   Conclusory allegations unsupported by factual data will not create a triable issue of fact allowing a party to survive a summary judgment motion.  (*Marks v. U.S.* (9th Cir. 1978) 578 F.2d 261, 263; *FTC v. Publ'g Clearing House, Inc.* (9th Cir. 1996) 104 F.3d 1168, 117).

As set forth more fully below, there are no triable issues of material fact which could defeat this motion. The facts demonstrate that plaintiffs cannot prove the requisite elements of any of their claims against defendants. While it is anticipated that plaintiffs will attempt to make factual allegations, any alleged "facts" are based on unsupported speculation, making them immaterial.  Therefore, defendants are entitled to summary judgment or partial summary judgment as there are no *facts* to support plaintiffs' allegations.

COLLINSON LAW
A PROFESSIONAL CORPORATION
21515 HAWTHORNE BLVD., SUITE 800
TORRANCE, CALIFORNIA 90503
TEL. (424) 212-7777 | FAX (424) 212-7757

COLLINSON LAW
A PROFESSIONAL CORPORATION
21515 HAWTHORNE BLVD., SUITE 800
TORRANCE, CALIFORNIA 90503
TEL. (424) 212-7777 | FAX (424) 212-7757

## III.   PLAINTIFFS' CLAIM OF EXCESSIVE FORCE/UNREASONABLE SEIZURE FAILS

To establish a claim of excessive force under the Fourth Amendment, plaintiffs must show that defendants used an amount of force that was objectively unreasonable under the totality of the circumstances from the perspective of a reasonable officer at the scene. (*Graham v. Connor* (1989) 490 U.S. 386, 397). Determining whether the force used is reasonable under the Fourth Amendment "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." (*Id.* at 396). This balancing test entails consideration of the totality of the facts and circumstances in the particular case, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." (*Id.*).

Moreover, the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. (*Jackson v. City of Bremerton* (9th Cir. 2001) 268 F.3d 646). The consideration of reasonableness must "embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." (*Id.*) "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers' violates the Fourth Amendment." (*Id.*) Police "are not required to use the least intrusive degree of force possible," but the inquiry is whether the force that was used to

10

1  effect a particular seizure was reasonable, viewing the facts from the perspective of

2  a reasonable officer on the scene.  (*Forrester v. City of San Diego* (9th Cir. 1994)

3  25 F.3d 804, 808).  During a lawful encounter, officers are "authorized to take such

4  steps as [are] reasonably necessary to protect their personal safety and to maintain

5  the status quo..."  (*U.S. v. $109,179* (9th Cir. 2000) 228 F.3d 1080, 1084).

6

7       Further, even if the Fourth Amendment rights of Martinez were violated,

8  those rights were personal to him and plaintiffs lack standing to raise that issue.

9  (*Alderman v. U.S.* (1969) 394 U.S. 165; *Smith v. City of Fontana* (9th Cir. 1987)

10  818 F.2d 1411).  Here, as explained below, the defendant officers were in

11  justifiable fear for the life of defendant Rivera based upon the actions of Martinez.

12       a.  <u>Martinez Posed an Immediate and Deadly Threat to Officer Rivera</u>

13       An officer may reasonably use deadly force when he confronts a suspect in

14  close proximity whose actions indicate intent to attack; in those circumstances, the

15  court cannot ask officers to hold fire in order to ascertain whether the suspect will,

16  in fact, injure or murder the officer. (*Martinez v. County of Los Angeles* (1996) 47

17  Cal. App.4th  334).

18       For example, in *Blanford v. Sacramento County* (9th Cir. 2005) 406 F.3d

19  1110, 2005 U.S. App. LEXIS 7893, two sheriff's deputies responded to a report

20  that a man wearing a ski mask and carrying a sword was walking through a

21  residential neighborhood and behaving erratically.  The deputies located Blanford,

22  who was walking in the opposite direction carrying a 2 ½ foot long saber by the

23  handle and wearing a ski mask pulled back from his face.  The deputies got out of

24  their vehicle, drew their guns, and one of them called out, "'Sheriff's department,

25  stop, drop the sword.'" (*Ibid*).  Blanford kept walking and did not notice the

COLLINSON LAW
A PROFESSIONAL CORPORATION
21515 HAWTHORNE BLVD., SUITE 800
TORRANCE, CALIFORNIA 90503
TEL. (424) 212-7777 | FAX (424) 212-7757

COLLINSON LAW
A PROFESSIONAL CORPORATION
21515 HAWTHORNE BLVD, SUITE 800
TORRANCE, CALIFORNIA 90503
TEL. (424) 212-7777 | FAX (424) 212-7757

deputies because unbeknownst to the deputies, he was wearing headphones and listening to music at a high volume. (*Ibid*).  The deputies followed Blanford at a distance of approximately 20 to 25 feet with their guns aimed at him, continuing to shout commands to drop the sword and warning that they would shoot.  (*Id.* at 1112-13).  Blanford continued walking up to the front door of a private home, searched his pockets and knocked on the door.  No one answered, and Blanford walked around the side of the house toward where there was a gate to the back yard.  The deputies again commanded Blanford to drop the sword, but he did not.  Both deputies fired their guns at Blanford as he rounded a corner to the gate because they were concerned that he posed a danger to anyone in the yard or house.  At least one shot struck Blanford, but he continued and went through the gate, closing it behind him.  One of the deputies opened the gate and saw Blanford trying to open a door to the garage which led to the house.  The deputy ordered Blanford again to drop the sword, but Blanford continued to try to open the door.  The deputy fired at Blanford again, hitting his wrist, because he was concerned that Blanford might get into the residence and hurt or kill someone inside.  (*Ibid*).  Blanford turned and walked toward the back yard, still holding the sword, and the deputy continued firing, severing Blanford's spine and rendering him a paraplegic.  It was later discovered that the house was Blanford's parents' house.  Only about fourteen seconds passed between the first and last shots, and the entire encounter took approximately two minutes. (*Id.* at 1113-14).

Blanford filed a civil suit against the deputies, the County, the Sheriff's Department and the Sheriff, alleging, inter alia, excessive force and false arrest under 42 U.S.C. § 1983, *Monell* liability, assault and battery and negligence.

(*Blanford*, *supra*, 406 F.3d at 1114).  The District Court granted summary judgment in favor of the defendants, finding that "[the deputies] acted in an objectively reasonable manner in firing each volley, because a reasonable officer in their position at the time would have believed that Blanford presented an imminent threat of death or serious bodily injury to persons inside the house or yard of [the residence], or to themselves." (*Ibid*).  The Ninth Circuit ruled that "The deputies' decision to fire was based upon Blanford's refusal to heed warnings and commands to drop the sword, as well as his attempt to enter a private residence and backyard with a lethal weapon.  These facts, objectively, and reasonably, led the deputies to conclude that the situation could not be resolved by talking, and that Blanford posed an immediate and unacceptable risk of harming whoever was in the house or yard should he be allowed to escape beyond the gate." (*Id.* at 1116).

Similarly, in *Cosentino v. Kurtz*, 2013 U.S. Dist. LEXIS 69218 (C.D. Cal. 2013), Downey police officers were granted summary judgment in a Fourth Amendment Section 1983 case when they shot and killed a man who was carrying an axe in the middle of the street and who ignored orders to drop the axe and moved toward the police officers' vehicle.  (*Id.* at *3-6).  Despite a dispute over whether the suspect raised the axe and despite the fact that there was no evidence the suspect committed a violent crime, the court found the use of deadly force objectively reasonable under the Fourth Amendment. (*Id.* at *19-20).

Here, the defendant officers justifiably feared for the life of Officer Rivera for the following reasons:

1.  Despite the officers repeated commands and pleas, Martinez refused to drop his knife;

COLLINSON LAW
A PROFESSIONAL CORPORATION
21515 HAWTHORNE BLVD., SUITE 800
TORRANCE, CALIFORNIA 90503
TEL. (424) 212-7777 | FAX (424) 212-7757

2.  Martinez followed the officers out of the entrance of the apartment and advanced on them while displaying the eight and one half inch knife in a threatening manner;

3.  Martinez focused his attention on Officer Rivera, pointed the knife at him, ignored Officer Rivera's commands to stop, and advanced to within three to five feet of Officer Rivera while threatening him with the knife; and

4.  After Martinez fell to the ground, he immediately began slashing at Officer Rivera's legs, which reasonably could have been thought to have imminently caused death or a serious life-threatening injury.

Therefore, the defendant officers reasonably believed that Martinez's actions posed an immediate and deadly threat to Officer Rivera's life which justified their use of deadly force.

### b.  No Specific Warning Required Before Using Deadly Force

Defendants anticipate that plaintiffs will argue that defendants should have given an explicit warning, such as, "drop the knife or I'll shoot," and in the absence of such an explicit warning, the officers' use of deadly force was objectively unreasonable.  However, as explained below, no such explicit "if/then" warning is required.  Instead, for the use of force to be reasonable, a police officer needs only to give appropriate instructions on how to comply before force is used "if feasible."

The *Graham* factors for evaluating the propriety of a use of force are not exclusive; instead, the Court must "examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*."  (*Glenn v. Washington City* (9th Cir. 2011) 673 F.3d 864, 872).  One such additional factor is whether or not a warning was given before force was used.  (*Nelson v. City of Davis* (9th Cir. 2012) 685 F.3d 867, 882 ("[W]e

COLLINSON LAW
A PROFESSIONAL CORPORATION
21515 HAWTHORNE BLVD., SUITE 800
TORRANCE, CALIFORNIA 90503
TEL. (424) 212-7777 | FAX (424) 212-7757

have held that 'the giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test.'" (*quoting Deorle v. Rutherford* (9th Cir. 2001) 272 F.3d 1272, 1284)).  In general, the Ninth Circuit has recognized that an officer must give a warning before using deadly force "whenever practicable."  (*Harris v. Roderick* (9th Cir. 1997) 126 F.3d 1189, 1201 (citing *Tennessee v. Garner* (1985) 471 U.S. 1, 11-12).

In *Deorle*, the Ninth Circuit held that the absence of *either* a warning *or* an order to halt was a factor in its application of the *Graham* balancing test.  (*Deorle*, *supra,* 272 F.3d at 1283-84); *cf. Forrester v. City of San Diego* (9th Cir. 1994) 25 F.3d 804 (holding that use of force was not unreasonable, in part because protesters were given warning and instructions on how to comply before force was applied)).

Here, the officers gave multiple audible commands in both English and Spanish to Martinez from a close distance prior to the use of deadly force. The officers repeatedly implored Martinez to "drop the knife," which provided him with a simple and clear instruction on how to comply with their commands to avoid the application of lethal force. Martinez actually acknowledged the officers' entreaties to drop the knife by shaking his head side to side.  Further, immediately prior to the shooting, defendant Rivera shouted to his fellow officers, "I don't want to shoot him" as Martinez ignored defendant Rivera's commands to stop advancing.  The officers' instructions combined with the fact that each of the officers had their pistols drawn during much of the approximately five minute encounter served as a clear warning that deadly force would be used unless Martinez dropped his knife.

As judged from the perspective of a reasonable officer on the scene,

COLLINSON LAW
A PROFESSIONAL CORPORATION
21515 HAWTHORNE BLVD., SUITE 800
TORRANCE, CALIFORNIA 90503
TEL. (424) 212-7777 | FAX (424) 212-7757

Martinez had obviously heard the officers' repeated commands as evidenced by his indication that would not comply by shaking his head "no."  Despite the obvious warning that the officers would use deadly force if their commands were not obeyed, Martinez's actions demonstrated to a reasonable officer his intent to ignore the commands and instead to use deadly violence, first against himself and then against Officer Rivera.

These facts are entirely distinguishable from *Deorle* which involved an officer's use of a beanbag gun to subdue a person who "was unarmed, had not attacked or even touched anyone, had generally obeyed the instructions given him by various police officers, and had not committed any serious offense."  (*Deorle*, *supra*, 272 F.3d at 1281).  Unlike Deorle, Martinez was dangerous, recalcitrant, and threatening.  (*See City and County of San Francisco, Calif. v. Sheehan* (2015) 135 S. Ct. 1765, 1776).  Therefore, the officers gave Martinez more than sufficient warnings and instructions on how to comply to avoid the use of deadly force, and the fact that those warnings and instructions went unheeded is an objective factor justifying defendants' use of force.

c. <u>No Liability for Alleged Tactical Errors Prior to the Use of Deadly Force</u>

Plaintiffs will also likely argue that the officers should have used a Taser, pepper spray, a beanbag shotgun or other less-lethal force to take custody of Martinez, and that failure gives rise to a Fourth Amendment claim.  However, the Ninth Circuit has rejected this notion when the use of deadly force was otherwise reasonable:

"Requiring officers to find and choose the least intrusive

COLLINSON LAW
A PROFESSIONAL CORPORATION
21515 HAWTHORNE BLVD., SUITE 800
TORRANCE, CALIFORNIA 90503
TEL. (424) 212-7777 | FAX (424) 212-7757

16

alternative would require them to exercise superhuman judgment.  In the heat of battle with lives potentially in the balance, an officer would not be able to rely on training and common sense to decide what would best accomplish his mission.  Instead, he would need to ascertain the *least* intrusive alternative (an inherently subjective determination) and choose that option and that option only.  Imposing such a requirement would inevitably induce tentativeness by officers, and thus deter police from protecting the public and themselves.  It would also entangle the courts in endless second-guessing of police decisions made under stress and subject to the exigencies of the moment. Officers thus need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable."

(*Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1992) (italics in original); see also, *Plakas v. Drinski*, 19 F.3d 1143, 1148-49 (7th Cir. 1993) ("... where deadly force is otherwise justified under the Constitution, there is no constitutional duty to use non-deadly alternatives first.").

Moreover, even when pre-shooting tactics contribute to the ultimate need to use deadly force, such tactics are not themselves actionable unless they constitute an independent constitutional violation.  (*Billington v. Smith* (9th Cir. 2002) 292 F.3d 1177, 1189-90).  Because the failure to bring less lethal equipment to a crime scene is not an independent Fourth Amendment violation, it is not actionable under *Billington*.  (See, *David v. City of Fremont*, 2006 U.S. Dist. LEXIS 57211 at *28-34 (N.D. Cal. 2006) (tactics of officer responding to suicidal man with a knife who did not wait for less lethal options to arrive before confronting and ultimately shooting the man in self defense were not independent constitutional violations).

COLLINSON LAW
A PROFESSIONAL CORPORATION
21515 HAWTHORNE BLVD., SUITE 800
TORRANCE, CALIFORNIA 90503
TEL. (424) 212-7777 | FAX (424) 212-7757

COLLINSON LAW
A PROFESSIONAL CORPORATION
21515 HAWTHORNE BLVD., SUITE 800
TORRANCE, CALIFORNIA 90503
TEL. (424) 212-7777 | FAX (424) 212-7757

## IV.  PLAINTIFFS LACK STANDING ON THE FOURTH AMENDMENT CLAIM

In the First Claim for Relief, Plaintiffs assert a wrongful death action under the Fourth Amendment for unlawful seizure of the decedent.  However, Fourth Amendment rights may not be vicariously asserted; they are personal to the decedent.  (*Smith v. City of Fontana* (9th Cir. 1987) 818 F.2d 1411, 1417).  Therefore, although the executor may maintain a survival action, Plaintiff Molina cannot assert a claim individually because there is no allegation that she was personally subjected to an unlawful seizure or use of force.  (*Ibid*).

"In § 1983 actions, . . . the survivors of an individual killed as a result of an officer's excessive use of force may assert a Fourth Amendment claim on that individual's behalf if the relevant state's law authorizes a survival action. The party seeking to bring a survival action bears the burden of demonstrating that a particular state's law authorizes a survival action and that the plaintiff meets that state's requirements for bringing a survival action."  (*Hayes v. County of San Diego* (9th Cir. 2013) 736 F.3d 1223, 1228, *quoting Moreland v. Las Vegas Metro. Police Dep't.* (9th Cir. 1998) 159 F.3d 365, 369 (internal citation omitted).

"California's statutory requirements for standing to bring a survival action are stated under *Code of Civil Procedure* § 377.30: 'A cause of action that survives the death of the person entitled to commence an action or proceeding passes to the decedent's successor in interest . . . , and an action may be commenced by the decedent's personal representative or, if none, by the decedent's successor in interest.' (*Tatum v. City & Cnty. of San Francisco* (9th Cir. 2006) 441 F.3d 1090, 1093 n.2) ("Where there is no personal representative for the estate, the decedent's

'successor in interest' may prosecute the survival action if the person purporting to act as successor in interest satisfies the requirements of California law . . . .") (citing *Cal. Civ. Proc. Code* §§ 377.30, 377.32), *see also, Hayes v. County of San Diego*, *supra*, 736 F. 3d at 1228).

Here, despite the pleadings, Plaintiff Molina does not represent the estate of the decedent and is not its successor in interest. She has not filed an affidavit asserting standing for maintaining an action for survival in the State of California. (See, *Cal. Civ. Proc. Code* § 377.32). Moreover, she has admitted in written discovery that she has no documents establishing that she is representing the estate. In contrast, the decedent was survived by a wife and children, who did file an affidavit asserting their status as successors in interest to the estate in an action in the Los Angeles Superior Court for the same incident. Furthermore, neither Plaintiff nor his wife believes the decedent had a will. Therefore, there is no evidence Plaintiffs have a right to recover on behalf of the decedent for his personal cause of action and the Fourth Amendment claim must be dismissed.

## V.   PLAINTIFFS' CLAIM OF INTERFERENCE WITH FAMILIAL INTEGRITY FAILS

In *Kelson v. City of Springfield* (9th Cir.1985) 767 F.2d 651, the Ninth Circuit held that the state's interference with parents' liberty interest in the companionship and society of their children without due process of law is cognizable under 42 U.S.C. § 1983. (*Id*. at 654). "[S]ubstantive due process claim[s] may be asserted by both the parents and children of a person killed by law enforcement officers." (*Moreland v. Las Vegas Metro. Police Dep't* (9th Cir. 1998) 159 F.3d 365, 371).

COLLINSON LAW
A PROFESSIONAL CORPORATION
21515 HAWTHORNE BLVD., SUITE 800
TORRANCE, CALIFORNIA 90503
TEL. (424) 212-7777 | FAX (424) 212-7757

COLLINSON LAW
A PROFESSIONAL CORPORATION
21515 HAWTHORNE BLVD., SUITE 800
TORRANCE, CALIFORNIA 90503
TEL. (424) 212-7777 | FAX (424) 212-7757

However, substantive due process violations under the Fourteenth Amendment occur only when official conduct "shocks the conscience." (*Gantt v. City of L.A.* (9th Cir. 2013) 717 F.3d 702, 707 (*citing Wilkinson v. Torres* (9th Cir. 2010) 610 F.3d 546, 554)). Under the overarching test of whether the official's conduct "shocks the conscience" are two standards: the more demanding "purpose to harm" standard and the lesser "deliberate indifference" standard. (*Porter v. Osborn* (9th Cir. 2008) 546 F.3d 1131, 1137 (applying purpose to harm standard when police officer killed suspect during quickly escalating investigation of suspicious vehicle)). To determine which of the two standards govern, courts look at the context of the events leading to the deprivation. (*Id.*) The critical consideration is whether the circumstances are such that actual deliberation by the officer is practical. (*Hayes v. Cnty. of San Diego* (9th Cir. 2013) 736 F.3d 1223, 1230). "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience. On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." (*Wilkinson*, 610 F.3d at 554 (*citing Porter*, 546 F.3d at 1137)).

When the alleged violation arises out of "fast paced circumstances presenting competing public safety obligations," the purpose to harm standard applies. (*Porter*, 546 F.3d at 1139). Due to the unforeseen circumstances demanding an officer's instant judgment, "even precipitate recklessness fails to inch close enough to harmful purpose" to shock the conscience. (*County of Sacramento v. Lewis* (1998) 523 U.S. 833, 853 (finding no substantive due process

COLLINSON LAW
A PROFESSIONAL CORPORATION
21515 HAWTHORNE BLVD., SUITE 800
TORRANCE, CALIFORNIA 90503
TEL. (424) 212-7777 | FAX (424) 212-7757

1   violation when patrol car rammed and killed 16-year-old suspected offender

2   following high-speed chase).  Because the purpose to harm standard is a subjective

3   standard of culpability, an officer violates due process if he uses force with "only

4   an illegitimate purpose in mind," such as bullying a suspect or getting even.  (*A.D.*

5   *v. Calif. Hwy. Patrol* (2013) 712 F.3d 446, 453).

6

7        Here, the officers were confronted with a quickly-evolving scenario that

8   demanded instant judgments such that the purpose to harm standard applies.  As

9   there is undisputedly no evidence from which to infer that the defendant officers

10  acted with any illegitimate purpose in mind or ulterior motive, plaintiffs' second

11  cause of action fails.

12  **VI.   PLAINTIFFS' CLAIM OF MUNICIPAL LIABILITY FOR**

13          **UNCONSTITUTIONAL CUSTOMS AND PRACTICES FAILS**

14

15       It is well-established that a local governmental entity such as the City cannot

16  be liable for damages pursuant to 42 U.S.C. §1983 based solely upon a theory of

17  *respondeat superior*. (*Monell v. Dept. of Soc. Serv.* (1978) 436 U.S. 658).  Instead,

18  plaintiffs have the burden of proving that the underlying civil rights violation

19  existed *and* was caused by a permanent and well-settled official policy or custom

20  of the public entity. (*City of St. Louis v. Praprotnik* (1988) 485 U.S. 112).  A

21  municipality can be liable under Section 1983 only where its policies are the

22  moving force behind the constitutional violation. (*City of Canton v. Harris* (1989)

23  489 U.S. 378, 389; *Blair v. City of Pomona* (9th Cir. 2000) 223 F.3d 1074).  There

24  must be an affirmative link between the policy and the particular violation alleged.

25  (*Oklahoma v. Tuttle* (1995) 471 U.S. 808, 823).

26       To establish *Monell* liability for a failure to train or adequately supervise

27

28

subordinates, the evidence must show a pattern of inadequate training which amounts to the deliberate indifference to rights of persons with whom the inadequately trained employees come into contact. (*City of Canton, supra*; *Davis v. City of Ellenburg* (9th Cir. 1989) 869 F.2d 1239).  Moreover, there is no liability pursuant to Section 1983 for negligence and such liability must be predicated upon a deliberate deprivation of constitutional rights by defendant. Neither negligent training of an employee nor a sound program occasionally administered negligently constitutes deliberate indifference. (*City of Canton, supra,* at 391).

   Finally, even if there was a violation of plaintiffs' rights, a single isolated incident does not establish official policy sufficient to render the municipality liable under Section 1983. (*Trevino v. Gates* (9th Cir. 1996) 99 F.3d 911, 918; *Adell v. Las Vegas Metro Pol. Dept.* (9th Cir. 2001) 268 F.3d 924). Proof of random acts or isolated incidents of unconstitutional action by a non-policymaking employee are insufficient to establish the existence of a municipal policy or custom. (*McDade v. West* (9th Cir. 2000) 223 F.3d 1135, 1141).

   Here, plaintiffs offer only conclusory allegations but no facts establishing either 1) an underlying constitutional violation, or 2) that any such violation occurred as a result of a permanent and well-settled official policy or custom of the City.  Moreover, even if plaintiffs' rights were violated, plaintiffs have offered no evidence establishing that such a violation was anything other than a random, isolated event. As such, this claim fails and should be dismissed as to the City.

   Plaintiffs will argue that failure at the time of the incident to require all officers to carry Tasers on their persons at all times was an unconstitutional policy. However, no case has ever so held, and courts have found to the contrary.  In

COLLINSON LAW
A PROFESSIONAL CORPORATION
21515 HAWTHORNE BLVD., SUITE 800
TORRANCE, CALIFORNIA 90503
TEL. (424) 212-7777 | FAX (424) 212-7757

COLLINSON LAW
A PROFESSIONAL CORPORATION
21515 HAWTHORNE BLVD., SUITE 800
TORRANCE, CALIFORNIA 90503
TEL. (424) 212-7777 | FAX (424) 212-7757

*Plakas*, *supra*, 19 F.3d at 1148-49, the Court held that there was "not a single precedent which holds that a governmental unit has a constitutional duty to supply particular forms of equipment to police officers."  More recently, in *Castro v. City of Mendota*, 2012 U.S. Dist. LEXIS 138699, *33-34 (E.D. Cal. 2012), the Court granted summary judgment on a *Monell* claim based on failure to equip deputies with Tasers, noting the lack of authority for such a proposition and that the officers had other options available that consisted of pepper spray, batons, physical force, and a beanbag shotgun (which they carried *inside their car*).  In light of the foregoing, it cannot be said that the City was deliberately indifferent for not imposing an absolute requirement that officers carry Tasers on their persons at all times on the date of the incident.

Nor can Plaintiffs establish that the lack of such a policy caused Martinez to be shot.  It is speculative as to whether the officers would have felt that a Taser was safe to use under the circumstances presented or if a Taser would have been effective. This lack of a causal connection also is fatal to Plaintiffs' *Monell* claim.

## VII.   THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

The individual Defendants are entitled to qualified immunity pursuant to the "good faith exception."  "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (*Harlow v. Fitzgerald* (1982) 457 U.S. 800, 818)  If the law governing the conduct was clearly established, the court then looks to whether, under that law, a reasonable officer could have believed the

conduct was lawful.  (*Harlow, supra*, at 818; *Act Up!/Portland v. Bagley* (9th Cir. 1993) 988 F.2d 868, 871).

So long as "a reasonable officer could have believed that his conduct was justified," a plaintiff cannot "avoi[d] summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless."  (*Billington v. Smith* (9th Cir. 2002) 292 F.3d 1177, 1189; *Saucier v. Katz, supra,* 533 U.S. at 216, n. 6 ("'[I]n close cases, a jury does not automatically get to second-guess these life and death decisions, even though a plaintiff has an expert and a plausible claim that the situation could better have been handled differently'"(quoting *Roy v. Inhabitants of Lewiston* (First Cir. 1994) 42 F.3d 691, 695)).

In the recent case of *City and County of San Francisco, Calif. v. Sheehan* (2015) 135 S. Ct. 1765, the Supreme Court considered the issue of qualified immunity in a factual scenario similar to the one presented here.  In that case, the Supreme Court held that the officers were entitled to qualified immunity, in part, because under Ninth Circuit law "Sheehan cannot 'establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided.'"  (*Id.* at 1777 (citing *Billington*, *supra*, 292 F.3d 1177 at 1190)).  Similarly, plaintiffs cannot establish a Fourth Amendment violation here based merely upon an allegation of bad tactics.  Defendants could not have known that the failure to first use a Taser before using deadly force when confronted by a suspect with a knife would violate plaintiffs' constitutional rights.  Without "fair notice," an officer is entitled to qualified immunity.  (*See*, *Plumhoff v. Rickard* (2014) 134 S.Ct. 2012, 2023).

DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

Considering the specific deadly situation confronting these defendant officers as discussed above, they had sufficient reason to believe that their conduct was justified.  As defendants' actions were in no way contrary to existing law, they are therefore entitled to qualified immunity.

## VIII.   <u>CONCLUSION</u>

Defendants respectfully request that the court grant their motion for summary judgment in its entirety.  Based on the undisputed facts of this case, plaintiffs' claims have no merit against any of these named defendants. Therefore, defendants are entitled to summary judgment on all claims and all causes of action set forth in plaintiffs' FAC. In the alternative, defendants request partial summary judgment as to each cause of action.

DATED:  January 13, 2017          COLLINSON LAW, A Professional Corporation

By:  _____/s/_____
      Laura E. Inlow, Esq.
      Matthew W. McAleer, Esq.
      Attorneys for Defendants,
      Ricardo Huerta, Rudolph Rivera, and
      Aldo Quintero

DATED:  January 13, 2017          **MICHAEL N. FEUER**, City Attorney
                                  **THOMAS H. PETERS**, Chief Assistant City
                                  Attorney
                                  **CORY M. BRENTE**, Assistant City Attorney

By:  _____/s/_____
      **RENA M. SHAHANDEH**, Deputy City
      Attorney
      Attorneys for City of Los Angeles

COLLINSON LAW
A PROFESSIONAL CORPORATION
21515 HAWTHORNE BLVD., SUITE 800
TORRANCE, CALIFORNIA 90503
TEL. (424) 212-7777 | FAX (424) 212-7757